UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

EDUCATIONAL TESTING SERVICE,

      Plaintiff,

      v.

ACTUATE CORPORATION,

      Defendant.

Civ. No. 10-1293 (AET) (TJB)

**[Non-Confidential Redacted Version]**

# DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Tonia Ouellette Klausner
Michael J. Marando*
Wilson Sonsini Goodrich & Rosati, P.C.
1301 Avenue of the Americas
40th Floor
New York, New York 10019-6022
(212) 999-5800
tklausner@wsgr.com

James A. DiBoise*
Wilson Sonsini Goodrich & Rosati, P.C.
One Market Street
Spear Tower, Suite 3300
San Francisco, CA 94105
(415) 947-2000
jdiboise@wsgr.com

Dylan J. Liddiard*
Wilson Sonsini Goodrich & Rosati, P.C.
650 Page Mill Rd.
Palo Alto, CA 94304
(650) 493-9300
dliddiard@wsgr.com

(*_pro hac vice_ admission pending)

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND .............................................................................................. 2

I.     ACTUATE CORPORATION AND ITS BUSINESS ............................................... 2

II.    ACTUATE'S SOFTWARE ...................................................................................... 2

     A.     Production Software ..................................................................................... 2

     B.     Development Software ................................................................................. 3

     C.     License Keys ............................................................................................... 4

III.    IMPORTANCE OF COMPLIANCE TO ACTUATE'S BUSINESS .............................. 5

IV.    RELATIONSHIP BETWEEN ACTUATE AND ETS .................................................. 5

     A.     The 2002 License ...................................................................................... 5

     B.     The 2005 License Agreement ................................................................... 6

           1.     Terms of the Agreement ................................................................. 6

           2.     Provision of License Keys .............................................................. 7

           3.     Subsequent Amendments to the License Agreement ....................... 8

     C.     The 2005 Professional Services Agreement .............................................. 8

V.    ETS'S BREACHES OF THE LICENSE AGREEMENT ............................................ 8

VI.    ACTUATE'S TERMINATION OF THE LICENSE AGREEMENT .......................... 10

ARGUMENT ................................................................................................................. 11

I.    ETS IS NOT LIKELY TO SUCCEED ON THE MERITS OF ITS
     WRONGFUL TERMINATION CLAIM .................................................................. 11

     A.     ETS Materially Breached The License Agreement ................................. 12

           1.     Improper Accessing of Development Software on
                Production Servers ........................................................................ 12

           2.     Improper Use of Development Software by Multiple
                Users ............................................................................................. 15

**TABLE OF CONTENTS**
*(Continued)*

**Page**

    B.    Actuate Gave More Than Sufficient Notice and Opportunity to Cure ................16

    C.    ETS's Suggestion that Actuate's Claims are Time-Barred is Irrelevant .............17

II.    ETS HAS FAILED TO DEMONSTRATE IT WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF A PRELIMINARY INJUNCTION............................ 18

    A.    Alleged Harm To ETS's Business, Even If True, Is Not "Irreparable" ..............19

    B.    ETS's Potential Breach Of Agreements With Customers Does Not Constitute Irreparable Harm................................................................................21

    C.    ETS Cannot Establish Irreparable Harm Based On Alleged Loss Of Customer Goodwill ................................................................................................22

III.    THE REMAINING FACTORS FAVOR DENIAL OF ETS'S MOTION .................... 23

CONCLUSION ......................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Acierno v. New Castle County,* 40 F.3d 645 (3d Cir. 1994) .................................................... 18, 23

*Am. Cent. Eastern Texas Gas Co. v. Union Pacific Resources Group, Inc.*, No. 2:98CV0239-TJW, 2000 WL 33176064 (E.D. Tex. July 27, 2000) ................................. 22

*American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421 (3d Cir. 1994) ........................................................................................................................... 11

*Apollo Technologies Corp. v. Centrosphere Indus. Corp.*, 805 F. Supp. 1157 (D.N.J. 1992) ........................................................................................................................... 22

*Atl. City Coin & Slot Serv. v. IGT*, 14 F. Supp. 2d 644 (D.N.J. 1998) ......................................... 19

*Bennington Foods LLC v. St. Croix Renaissance Group, LLP*, 528 F.3d 176 (3d Cir. 2008) ............................................................................................................... 19, 20, 22, 23

*Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86 (3d Cir. 1992) ............................................... 22

*Cancer Genetics, Inc. v. Hartmayer*, Civil Case No.07-5463(FSH), 2008 WL 323738 (D.N.J. Feb. 5, 2008) ................................................................................................... 11

*Commonwealth of Pennsylvania v. U.S. Department of Agriculture*, 469 F.2d 1387 (3d Cir. 1972) ........................................................................................................... 24

*ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223 (3d Cir. 1987) ...................................................... 21

*Educ. Testing Servs. v. Katzman*, 793 F.2d 533 (3d Cir. 1986) ................................................... 23

*Emergency Accessories & Installation, Inc. v. Whelen Engineering Co.*, Civil Action No. 09-2652 (JEI/AMD), 2009 WL 1587888 (D.N.J. June 3, 2009) .......................... 19, 21

*Frank's GMC Truck Center, Inc. v. General Motors Corp.* 847 F.2d 100 (3d Cir. 1988) ................................................................................................................. 21

*In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137 (3d Cir. 1982) .................................... 11

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797 (3d Cir. 1989) ............... 19, 20, 21

*Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700 (3d Cir. 2004) ................................................. 23

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578 (3d Cir. 2002) ................................................................................ 23

*Nutrasweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151 (3d Cir. 1999) ......................................... 11

*Ortho Biotech Products v. Amgen Inc.*, Civil No. 05-4850 (SRC), 2006 WL 3392939 (D.N.J. Nov. 21, 2006) ................................................................................................. 23

**TABLE OF AUTHORITIES**
*(Continued)*

**Page(s)**

*Peter Kiewet Sons' Inc. v. Atser, LP*, No. 8:08CV541, 2009 WL 103537 (D. Neb. Jan
 12, 2009) .................................................................................................................. 19

*Precision Links Inc. v. USA Prods. Group, Inc.*, Civil No. 3:08cv576, 2009 WL
 3076114 (W.D.N.C. Sept. 22, 2009) .............................................................. 22

*Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 908 (2d Cir. 1990) .................. 19

*Sampson v. Murray*, 415 U.S. 61 (1974) .................................................................. 19

*SK & F Co. v. Premo Pharm. Lab., Inc.*, 625 F.2d 1055 (3d Cir. 1980) ..................... 24

*Tanimura & Antle, Inc. v. Packed Fresh Produce, Inc.*, 222 F.3d 132 (3d Cir. 2000) ................. 24

## PRELIMINARY STATEMENT

In its motion for a preliminary injunction, Plaintiff Educational Testing Service ("ETS") effectively asks this Court to compel Actuate Corporation ("Actuate") to grant ETS a compulsory license to use Actuate's sensitive, proprietary software – despite ETS's history of repeated, unauthorized conduct with respect to that very same software.  ETS's motion should be denied.

The Third Circuit has made clear that a preliminary injunction is an "extraordinary" remedy appropriate only in the most limited of circumstances.  For that reason, the burden on a party seeking such an injunction is severe.  ETS has utterly failed to meet this heavy burden.  *First*, ETS has failed to demonstrate that it is likely to succeed on the merits of its wrongful termination claim, the sole basis for ETS's preliminary injunction application.  To the contrary, the evidence shows that ETS repeatedly and in several different ways breached the license agreement that governs ETS's access to Actuate's proprietary software.  In light of these breaches – which, despite ample notice, ETS has failed to acknowledge, let alone remedy – Actuate is more than justified in invoking its termination rights under the license agreement.

*Second*, ETS has failed to show it would suffer immediate, irreparable injury should the Court deny its request for emergency relief.  Although ETS suggests that its business would suffer greatly should Actuate be permitted to invoke its termination rights, ETS fails to support this contention with anything other than conclusory allegations.  More importantly, even if ETS were able to show that its business would be harmed as a result of Actuate's termination, the Third Circuit has made clear that such harm – even where substantial – is not irreparable.  To the contrary, the types of harms alleged by ETS – harm to its business operations, inability to meet customer contracts and the like – are entirely compensable and thus can be fully remedied upon final resolution of ETS's claim.

1

For these reasons, as well as the additional reasons stated below, ETS's motion should be denied.

## FACTUAL BACKGROUND

### I.   ACTUATE CORPORATION AND ITS BUSINESS

Actuate Corporation ("Actuate") was founded in 1993 and is headquartered in San Mateo, California. (Nguyen Decl. ¶3).[1] Actuate provides computer software and services for business intelligence and reporting, as well as performance management applications, in North America, Europe, the Middle East, and the Asia/Pacific Region. (*Id.*). Actuate offers a suite of business intelligence and reporting products that provide interactive web reports, brochure-quality reporting, business analytics, and spreadsheet reporting. (*Id.* ¶4). Its business intelligence and reporting product line provides a platform that enables organizations and software vendors to develop and deploy information applications in various business functions, including financial management, sales management, account management, and customer self-service. Actuate has over 4,500 customers globally in diverse businesses including financial services, government, health care, education, manufacturing, pharmaceuticals, telecommunications, high technology, utilities, automotive, entertainment, travel, retail and others. (*Id.*).

### II.   ACTUATE'S SOFTWARE

Actuate's software is most commonly used by licensees in two broad modes – "production" and "development." (Nguyen Decl. ¶5).

#### A.   Production Software

A "production" environment exists when the licensee is using software in the normal course of its business to help manage and analyze data. (*Id.* at ¶6). The software that is licensed for use in a "production" environment is referred to as "production software." The base application on which

---

[1] "(Nguyen Decl. ¶___)" refers to the numbered paragraphs of the Declaration of My Nguyen filed concurrently with this Memorandum of Law.

the majority of Actuate production software operates is called the "iServer." (*Id.*). Actuate's

iServer is a scalable, world-class server software used for generating, managing and securely

delivering interactive, actionable business information to a licensee's employees, customers and

partners. (*Id.*). In addition to the iServer, Actuate offers a number of other software options that

can be added to this base application. Actuate customers who arrange for production software

licenses are able to access the iServer, as well as any additional software options elected by the

licensee, to run as their production software. (*Id.*).

Actuate typically licenses the use of iSever production software based on the number of

Central Processing Units ("CPUs") on which the software is to be run. (Nguyen Decl. at ¶7). A

licensee will have unlimited use of the production software with respect to the licensed CPUs, but

may not install the software to be run on additional CPUs without purchasing additional licenses.[2]

(*Id.*).

**B.     Development Software**

Actuate also offers its customers the ability to license its "iServer Developer Pack" or

"development software." (*Id.* at ¶8). In contrast with production software, which limits a user's

access to only those software options specifically paid for by the licensee, the iServer Developer

Pack contains the full range of software options available from Actuate. (*Id.*). When licensing the

iServer Developer Pack software, licensees have the opportunity to sample any new and additional

software applications.

---

[2] The production software itself is installed on a specified server, which in turn has a certain number
of CPUs in use. If a customer wants to install the software on additional servers, the customer must
purchase the appropriate number of licenses depending on how many CPUs will run the software on
that server. (Nguyen Decl. at ¶7).

Actuate licenses development software on a "Named Developer" basis, which permits use of the software by a single, named employee of the licensee.[3] (Nguyen Decl. ¶9). For this reason, Actuate is able to license the Named Developer software at a significantly lower price point as compared with the production software. (*Id.*). Indeed, a one-CPU license for production software that permits access to the same set of functionality as a Named Developer license would be approximately 25-times the cost. (*Id.*). Because of this pricing structure, it is absolutely critical that Actuate's customers comply with the contractual restrictions strictly limiting access to and use of the Named Developer software; otherwise, customers and their employees could gain broad access to Actuate's proprietary software and applications essentially for free. (*Id.*).

**C.    License Keys**

Typically, Actuate will provide a licensee with a single software package that includes all of Actuate's applications. (Nguyen Decl. at ¶10). Then, depending on the nature and scope of the licenses purchased by a customer, Actuate will issue one or more     REDACTED    ' that permit the customer to access or "unlock" the licensed features, while preventing the customer from gaining access to other, non-licensed features. (*Id.*).

REDACTED   are specifically designed and intended to prevent licensees and their employees from unauthorized access to or use of Actuate software. (*Id.*). For example, a CPU-based

REDACTED                    which is intended for the licensee's production environment only, will unlock and permit access to only those applications for which the licensee paid. (*Id.*). By contrast, an               REDACTED                   · which is intended for the licensee's development environment only, will unlock and permit access to the entire range of Actuate software options. (*Id.*). In order to be fully effective, the   REDACTED      issued by Actuate to a customer must be properly used – and not abused – by that customer. (*Id.*).

---

[3] A "Named Developer license" is a license to use Actuate's development software. Accordingly, "Named Developer license" and "development software license" are used interchangeably herein.

### III.   IMPORTANCE OF COMPLIANCE TO ACTUATE'S BUSINESS

Compliance by Actuate's customers with the limitations set forth in the governing license agreements is critical to Actuate's business model and success. (Boudraa Decl. at ¶5).[4] Historically, it has been difficult for Actuate to ensure that customers are not exceeding the scope of their licenses – whether by exceeding the number of authorized persons entitled to access the software, installing        REDACTED       to run software on an unauthorized number of CPUs, or otherwise exceeding the scope of their license. (*Id.*). By and large, Actuate has relied on the good faith of its customers and trusted that licensees would comply with their obligations under the applicable agreement. (*Id.*)

More recently, Actuate developed new controls to monitor customer compliance. (*Id.* at ¶6). In order to implement these controls, Actuate required certain information from the licensee so that Actuate could correctly configure the upgraded   REDACTED      and software. (*Id.*). When Actuate started to receive this information from its licensees, Actuate was surprised by the magnitude of unauthorized use that was uncovered. (*Id.* at ¶7). As a result, Actuate stepped up its enforcement efforts even further. (*Id.*). Unfortunately, as part of Actuate's increased enforcement efforts, from time to time Actuate has been compelled to litigate issues in order to enforce its rights and ensure compliance. (Boudraa Decl. ¶8). In none of these litigations has Actuate been found to have wrongfully terminated a license agreement or to otherwise have engaged in wrongful conduct.

### IV.   RELATIONSHIP BETWEEN ACTUATE AND ETS

#### A.   The 2002 License

On December 22, 2002, ETS entered into a Purchase Authorization Letter ("PAL") to license production software from Actuate. (Nguyen Decl. ¶14). The CPU-based production software license granted pursuant to the PAL permitted ETS to run the software on one CPU.

---

[4] "(Boudraa Decl. ¶___)" refers to the numbered paragraphs of the Declaration of Dylan Boudraa, filed concurrently with this Memorandum of Law.

(Nguyen Ex. A).  In addition to enabling access to the iServer, the CPU-based production software license also allowed ETS to utilize three additional specified software options.[5]  (Nguyen Decl. ¶15); (Nguyen Ex. B).  In lieu of a license agreement, prior to installing the production software on its server ETS had to agree to certain terms and conditions.  (Nguyen Decl. at ¶16).  These terms and conditions came standard on all Actuate software during that time period, and had to be agreed to by the customer before installation of the licensed software could proceed.  (*Id*. at ¶16).

**B.      The 2005 License Agreement**

      1.      Terms of the Agreement

On March 30, 2005, ETS and Actuate entered into an End User License Agreement ("License Agreement" or "Agreement").  (Nguyen Decl. at ¶18); (Nguyen Ex. C).  The License Agreement granted ETS the right to use Actuate's software in both production and development environments.  (Nguyen Decl. at ¶18).  More specifically, under the terms of the License Agreement, ETS was granted a perpetual CPU-based production license for one additional CPU of production software (for a total of two licensed CPUs).  (*Id*.).  The License Agreement permitted ETS to install the software on one identified server to be run on one CPU only, though there was no limitation as to the number of ETS employees that could access that particular server.  (Nguyen Decl. ¶19); (Nguyen Ex. C at Section 2.05).  Although the production software license necessarily provided ETS employees with access to the iServer base application, ETS elected to pay for only one additional software option as part of its license; namely, the eReport option.  (Nguyen Decl. ¶19).

The License Agreement also permitted ETS certain access to Actuate's iServer Developer Pack Named Developer software.  (Nguyen Ex. C).  In particular, pursuant to the Agreement, ETS

---

[5] ETS also elected to purchase support and maintenance for this software for a twelve month period. (Nguyen Ex. A).

licensed for three "Named Developers" to be granted access to development software. (Nguyen Decl. ¶20). Because these Named Developer licenses were charged on a per developer basis, access or use of Actuate's development software was explicitly limited to the three identified individuals and restricted to development use only. (Nguyen Decl. ¶20). By virtue of the Named Developer licenses, the three identified developers had access not only to the iServer base application and eReport option available through ETS's production software license, but also to the full range of options available in connection with Actuate software.[6] (Nguyen Decl. ¶20).

2.      Provision of License Keys

On March 31, 2005, Actuate provided ETS with      REDACTED     . via email to unlock the licensed software–                    REDACTED                    (Nguyen Exs. D and E). These      REDACTED    were specifically tailored to permit access to Actuate's software in accordance with the options and license type elected and paid for by ETS. (Nguyen Decl. ¶22). In particular,      REDACTED     , which was provided for ETS's production environment, limited ETS's access to the iServer and eReport options (i.e., the specific production software options elected by ETS). (*Id.*). By contrast,      REDACTED     ., which was provided for use in ETS's development environment only, was an                    REDACTED                    and therefore provided access to all of the options available on Actuate software.[7] (*Id.*).

Given the importance of the   REDACTED    in protecting Actuate's intellectual property, prior to using the   REDACTED   . ETS was required to read and agree to certain terms and conditions, including the condition that, "in the event the   REDACTED   . are used with Actuate Software that

---

[6] In addition, as part of the 2005 License Agreement, ETS also (a) purchased maintenance services on the new software, and (b) paid maintenance reinstatement fees for the existing production license from December 2002. (Nguyen Ex. C).

[7] This included access to the following applications: Spread, Report, MultiApp, PageSecure, Analysis, ActuateQuery, ActuateAnalytics, SapBWConn, SapR3Conn, PeopleSoftConn, Online Archive, F1Report, DataIntegration, InfoObjectsCaching, RecordMatcher, and NameSearch. (Nguyen Ex. E).

[ETS] has not properly licensed, [ETS] will immediately remit the applicable license and maintenance fees for such Software to Actuate." (*Id.*).

### 3.   Subsequent Amendments to the License Agreement

In 2005 and 2006, the License Agreement was amended to add additional production and development licenses. (Nguyen Decl. ¶21). Specifically, in December 2005, ETS licensed production software – with access limited to the iServer and the eReport option – for an additional four CPUs beyond the two CPUs that had already been authorized.[8] (*Id.*). Then, in December 2006, ETS purchased another two CPU-based production licenses, which permitted production software to be installed on an additional two CPUs. (*Id.*). At this time, ETS also purchased two additional Named Developer licenses, which permitted the development software to be used by an additional two named developers. (*Id.*). Thus, after entering these amendments, ETS had (a) CPU-based production software licenses (with the iServer and eReport option) for eight CPUs, and (b) iServer Developer Pack software licenses for five Named Developers.

### C.   The 2005 Professional Services Agreement

In addition to the License Agreement, on April 21, 2005, ETS and Actuate entered into an Agreement for Professional Services ("Professional Services Agreement"). (Nguyen Decl. ¶27). Pursuant to the Professional Services Agreement, Actuate agreed to provide certain services in connection with the licensed software, which services were detailed in an attached Statement of Work. (*Id.*).

## V.   ETS'S BREACHES OF THE LICENSE AGREEMENT

In October 2008, ETS requested the newest version of Actuate's software, Version 9. (Boudraa Decl. ¶9). Prior to performing the upgrade, and consistent with its processes, Actuate requested that ETS identify the particular servers that comprised ETS's production environment, as

---

[8] ETS also purchased maintenance services on this software for one year. (Nguyen Decl. ¶21).

well as the   REDACTED   that had been employed on those servers. (*Id.* at ¶9).  In response, ETS

informed Actuate that it was using                         REDACTED                         , for all

four of its production servers. (*Id.* at ¶10).  Although ETS attempted to pass off the REDACTED   as a

CPU-based   REDACTED   ￢, even a quick review of the   REDACTED   information makes clear

this is not the case.  This information reveals that the   REDACTED   enabled access to countless

Actuate software options, none of which were included in ETS's CPU-based production software

license. (*Id.*).  As a result of ETS's misuse of the   REDACTED   in its

production environment, countless unauthorized users had full access to Actuate's Named

Developer software and all of its functionality.  (Nguyen Decl. ¶28).  Had ETS purchased even a

single CPU-based software license for use in production permitting an unlimited number of users to

access all of the functionality included within the development software license, the purchase price

for this software would have been exponentially greater than that which ETS paid for each of its

Named Developer licenses. (*Id.* at ¶10).

    Around the same time, Actuate became aware that ETS had materially breached the License

Agreement in another way as well.  (Boudraa Decl. ¶11).  As discussed above, the five Named

Developer licenses granted to ETS were "Named Developer" licenses, which means that each

license permitted a "single, identified developer" to access Actuate's development software for

development use only.  (Nguyen Ex. C at Section 2.06).  In clear violation of this requirement,

Actuate discovered that there had been system activity at login access by over 300 unique user

accounts in ETS's non-production environment.[9]  (Boudraa Decl. ¶11).  When confronted with this

information, ETS did not deny the vast number of unique user accounts and system activity

associated with its development servers.  Instead, ETS attempted to attribute the activity across

_____

[9] Actuate also discovered that the two development servers accessed by the unauthorized users were
labeled by ETS as "Testing" and "Staging," indicating that ETS had been using the development
environment to simulate production usage scenarios and perform quality assurance testing in
contravention of the scope and spirit of the development license.  (Boudraa Decl. ¶11).

these hundreds of user accounts to four named developers in the hope that this would legitimize

ETS's use – a circumstance that would have required each individual to have employed over

seventy-five unique user names.  (Boudraa Decl. at ¶12).

## VI.    ACTUATE'S TERMINATION OF THE LICENSE AGREEMENT

After Actuate confronted ETS regarding its breaches, in or around October 2008,

discussions between the parties ensued.  (*Id.* at ¶13).  In December 2008, with the parties still

unable to reach resolution, Actuate's General Counsel sent ETS a formal, written notice in which he

detailed ETS's breaches and demanded that ETS take corrective action.  (*Id.*).  Actuate's notice

prompted further discussions between the parties and, in January 2009, Actuate's compliance

director suggested an in-person meeting.  (*Id.* at ¶14).  Unfortunately, :     REDACTED

. . .            REDACTED                         REDACTED

), ETS refused to meet unless Actuate would first agree to certain pre-conditions.

(*Id.*).

Discussions between the parties continued into 2009.  With the parties still unable to reach a

resolution, on or about February 22, 2010 – over a year after Actuate provided written notice under

the License Agreement – Actuate invoked its right to terminate the Agreement pursuant to Section

9.01.  (Boudraa Decl. ¶15; Boudraa Ex. A).  In accordance with Section 9.02 of the License

Agreement, Actuate instructed ETS to immediately discontinue use of all licensed software and to

return such software to Actuate.  (*Id.*).

Rather than comply with its contractual obligation, on March 11, 2010, ETS filed the instant

action, in which ETS alleges that Actuate wrongfully terminated the License Agreement.  (*See* Pl.'s

Compl.).  Two weeks later, ETS filed its motion for a preliminary injunction, in which ETS asks the

Court to compel Actuate to continue to provide ETS with access to Actuate's proprietary software

until ETS's wrongful termination claim is finally resolved.

## ARGUMENT

A preliminary injunction is "an extraordinary remedy" and "should be granted only in limited circumstances." *American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426-27 (3d Cir. 1994).  A preliminary injunction should be entered only if the Court concludes that:  (1) the plaintiff is likely to succeed on the merits of its claim; (2) the plaintiff is likely to suffer irreparable harm if an injunction is denied; (3) granting the requested relief will not result in greater harm to the defendants; and (4) granting the injunction will serve the public interest.  *Id.*; *Nutrasweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999).  A party seeking a preliminary injunction must establish that all four factors favor the relief sought; if the movant fails to produce evidence sufficient to demonstrate even just one factor, the court must deny the motion.  *Nutrasweet Co.*, 176 F.3d at 153.

Here, ETS cannot meet its burden with respect to any of the four required considerations. Accordingly, ETS's motion should be denied.

## I.      ETS IS NOT LIKELY TO SUCCEED ON THE MERITS OF ITS WRONGFUL TERMINATION CLAIM

ETS's motion for a preliminary injunction hinges entirely on its claim that Actuate wrongfully terminated the License Agreement.  *See* ETS Brief at 9 n.6.  ETS, however, has failed to sustain its burden of demonstrating that it is ultimately likely to succeed on the merits of this claim. For this reason alone, ETS's motion for a preliminary injunction must be denied.  *See, e.g., Cancer Genetics, Inc. v. Hartmayer*, Civil Case No. 07-5463(FSH), 2008 WL 323738, *3 (D.N.J. Feb. 5, 2008) (failure of plaintiff to show likelihood of success on the merits "'must necessarily result in denial of a preliminary injunction'") (quoting *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir. 1982)).

**A.     ETS Materially Breached The License Agreement**

Section 9.01 of the License Agreement permits Actuate to terminate the Agreement if ETS

REDACTED                          REDACTED                          REDACTED

REDACTED                          Here, the evidence shows that ETS in

fact committed multiple breaches of the License Agreement, each of which in itself provides a basis

for Actuate's termination of the Agreement.

      1.     <u>Improper Accessing of Development Software on Production Servers</u>

There can be no question – and ETS does not dispute – that the License Agreement prohibits

the use of a          REDACTED          for development software in ETS's production

environment.  More specifically, Section 2.06 of the License Agreement provides that

REDACTED                                          REDACTED

REDACTED

License Agreement, Section 2.06 (emphasis

added).  Such restrictions, which are standard in Actuate's license agreements generally, and which

were integral to the ETS License Agreement in particular, are critical to ensure that Actuate's

customers are not exceeding the scope of their license grants or otherwise using Actuate's valuable

software in an unauthorized manner.  (Nguyen Decl. ¶10).

In clear violation of the above restrictions, ETS utilized a          REDACTED

to access Actuate software in production environments, thereby permitting thousands of

ETS employees unauthorized access to countless components of Actuate's software.  Specifically,

ETS used          REDACTED                                          – to gain access to

Actuate's software on at least four two-CPU production-dedicated servers.  (*Id*. at ¶24; Nguyen Ex

E).  Indeed, ETS does not dispute that the     REDACTED     was used on ETS's production servers to

access Actuate software.  Instead, ETS maintains that the     REDACTED     is not a     REDACTED

at all, but rather is a <span>REDACTED</span> – or in other words, ***both*** that Actuate emailed to ETS were <span>REDACTED</span>. In support of its facially absurd position, ETS relies on two entries contained within the <span>REDACTED</span> <span>REDACTED</span>

<span>REDACTED</span> *See* ETS Brief at 13-14.

ETS's attempt to explain away its conduct (including its failure to seek clarification from Actuate as to which was for production and which for development if it had any doubt) by relying on these two entries does not withstand scrutiny. The same <span>REDACTED</span> information from which ETS plucked the entries noted above – when examined as a whole – makes clear that the <span>REDACTED</span> is necessarily <span>REDACTED</span> and not a <span>REDACTED</span> This information readily reveals that the <span>REDACTED</span> permits a user to access multiple components and engage in numerous functions with respect to Actuate's software that would not have been possible with ETS's <span>REDACTED</span>. For example, while ETS's production license permitted access to the iServer and eReport applications, the <span>REDACTED</span> enabled access to a number of additional software applications, including Spread, Report, MultiApp, PageSecure, Analysis, ActuateQuery, ActuateAnalytics, SapBWConn, SapR3Conn, PeopleSoftConn, Online Archive, F1Report, DataIntegration, InfoObjectsCaching, RecordMatcher, and NameSearch. (Nguyen Decl. ¶24; Nguyen Ex. E). ETS does not even attempt to explain the differences between the two or why it presumably used the same for both production and development and did not use the second at all.

Moreover, the two entries that ETS so heavily relies on to justify its conduct, were nothing more than the result of a typical software bug – something that no doubt was apparent to ETS given all of the circumstances noted above. (Nguyen Decl. ¶¶23-24) Indeed, the fact that these entries were present in both the <span>REDACTED</span> in itself should have made clear that ETS could not rely on them to distinguish which was for production software and which was for

13

development software.[10]  It was ETS's obligation to ensure it was utilizing the correct        for the

correct purpose and it plainly failed to do so.

Recognizing that it cannot reasonably rely on identical entries in both        ETS makes two

additional arguments in defense of its misuse of the        REDACTED        both of which

should be rejected.  *First*, ETS suggests that it should not be held liable because it did not actually

utilize the additional functionality permitted by the        REDACTED

Putting aside for the moment the veracity of ETS's non-use claim, the mere fact that ETS installed

and accessed Actuate's development software on its production-dedicated servers using the        REDACTED

REDACTED   in itself is a clear violation of the License Agreement.  There is no requirement that

ETS must have taken maximum advantage of its breach in order to be liable.  Additionally, given

the lack of care that ETS paid to ensuring it was using the appropriate        ; for production and

development respectively, there is no basis to credit its conclusory assertion that its employees

never accessed any of the many functions to which they concededly were given improper access.

*Second*, ETS asserts that, because Actuate provided certain services in connection with the

installation and servicing of its software, any misuse of the        REDACTED is the fault of Actuate and not

ETS.  But ETS agreed to bear responsibility for ensuring compliance with its contractual

obligations; nothing in the Professional Services Agreement shifted that obligation to ETS.

Additionally, as ETS concedes, since at least April 2005 when the Professional Services Agreement

was signed, ETS has had their infrastructure managed by a third-party service provider,        REDACTED

REDACTED                        .  (Hoffman Decl. ¶5).[11]  More importantly, in his October 2008 email

to Actuate, which prompted Actuate's concerns on this issue, Gerald Hofmann of ETS clearly

---

[10] The fact that certain entries on the   REDACTED   were faulty was also apparent by the entries
        REDACTED   Although this entry could be read as authorizing installation of the key on three
CPUs, at the time this license key was issued, ETS had production licenses for only two CPUs.
[11] "Hoffman Decl. ¶___" refers to the Declaration of Gerald T. Hoffman In Support of Plaintiff ETS's Application for
an Order to Show Cause dated March 24, 2010 and filed with this Court on March 26, 2010.

14

REDACTED

indicates that it was ETS – and not Actuate – that made the decision to install the

REDACTED

on ETS's production environment servers.  (Melnik Ex. 3)[12] ("looking into

this we find that we did in fact use the same      file on all 4 of our production servers . . . . [W]e

(ETS) was lax in going back and updating the license files.").  Even if an Actuate engineer were to

have trained or otherwise assisted with the installation effort, it was ETS that received the      from

Actuate and it was ETS that decided which      to install on which computer.

      2.    <u>Improper Use of Development Software by Multiple Users</u>

ETS also breached the License Agreement by exceeding the permissible number of users of

the Named Developer software installed on ETS's development-dedicated severs.  As noted above,

because ETS's development software licenses were charged on a per developer basis, the License

Agreement provides that each "Named Developer License" may be accessed or used      REDACTED

REDACTED

. Because ETS purchased five Named

Developer licenses, under the terms of the License Agreement only five specified developers should

have been permitted to access and use the development software.  (*Id.*).

Despite the fact that ETS was limited to five developers, Actuate discovered that ***over three***

***hundred*** log-in names had been created and actively used by ETS unique user accounts to access

the Named Developer software.  (Boudraa Decl. ¶11).  Moreover, the majority of these user names

appear to have been formed using a unique first initial and last name (Nguyen Decl. ¶29), strongly

suggesting that they are associated with separate individuals.  Remarkably, since Actuate brought

this discrepancy to ETS's attention in December 2008, ETS's only response has been the

conclusory assertion (regurgitated in ETS's moving brief) that developers create different log-in

names to test different applications.  *See* ETS Brief at 17.  ETS's persistent assertion that the

---

[12] "Melnik Ex. ___ " refers to the exhibits attached to the Declaration of Joseph Melnik, Esq. in Support of Plaintiff
ETS's Application for an Order to Show Cause dated March 25, 2010 and filed with this Court on March 26, 2010.

hundreds of log-in names identified by Actuate belong exclusively to four identified developers[13] – in other words, that each of the four developers have, at minimum, employed seventy-five log-in names (Boudraa Decl. ¶12) – defies credulity. [14]  Not surprisingly, none of ETS's four named developers attached declarations in support of its motion with evidence to support ETS's speculation as to what "may" have occurred.

In short, ETS essentially concedes that it breached the Agreement by using the wrong key for production and has presented no evidence to support its incredulous hypothesis as to the reason for over three-hundred long-in names having been used for software licensed to only five named developers.  Its flimsy showing falls far short of that necessary to find a likelihood of success on the merits.[15]

## B.    Actuate Gave More Than Sufficient Notice and Opportunity to Cure

Unable to explain away its breaches, ETS next contends that Actuate's termination of the License Agreement was wrongful because Actuate failed to provide sufficient notice and opportunity to cure.  ETS's claim is without merit.  As ETS concedes, Actuate provided clear, written notice of ETS's material breaches at least as far back as December 2008.  *See* ETS Brief at 7; *see also* Letter from T. McKeever to A. Diaz, Melnik Decl. Ex. 3.  Moreover, subsequent to Actuate's December 2008 notice, the parties engaged in numerous discussions concerning ETS's unauthorized conduct – via email, letter and even in person.  (Boudraa Decl. ¶13-14).  Throughout

---

[13] Although ETS purchased five Named Developer licenses from Actuate, ETS has maintained that it has only four developers accessing and using all these IDs.  (Boudraa Decl. ¶12).

[14] ETS's use of hundreds of user names in the development environment also evidences use of the software for other than "development purposes" – something that Actuate had become concerned about around the same time and something that also would violate the spirit and scope of the Named Developer license.  (Boudraa Decl. ¶11); *see also* ( _____ REDACTED _____        REDACTED

[15] In addition to the breaches described above, Actuate also has reason to believe that ETS may have violated its contractual obligations to Actuate by transferring Actuate software from a Sun Solaris hardware environment to an Intel-compatible hardware running Linux.  (Nguyen Decl. ¶ 17).

these discussions, ETS essentially reiterated the half-hearted denials disposed of above.  At no point did ETS acknowledge its breaches or express any intention to cure.[16]  (*Id.*).  Faced with ETS's steadfast refusal to acknowledge – let alone cure – its material breaches of the License Agreement, Actuate appropriately exercised its right to terminate.  (Boudraa Decl. ¶15); *see also* (Nguyen Ex. C at Section 9.01).

### C.    ETS's Suggestion that Actuate's Claims are Time-Barred is Irrelevant

While arguing on the one hand that Actuate did not give sufficient notice, ETS remarkably argues on the other that Actuate is somehow time-barred from defending against ETS's motion.  Specifically, ETS asserts that "Actuate's allegations against ETS are precluded" because more than two years have elapsed since Actuate had notice of ETS's breaches.  ETS Brief at 18-19.  In making this argument, ETS relies exclusively on Section 10.18 of the License Agreement, which states that

REDACTED                               REDACTED

Contrary to ETS's suggestion, Section 10.18 is entirely irrelevant to ETS's likelihood of success on the merits of its wrongful termination claim – the sole basis for ETS's preliminary injunction application.  *See* ETS Brief at 9, n.6.  By its plain language, Section 10.18 purports to

REDACTED

limit the circumstances under which a party can

License Agreement, Section 10.18 (emphasis added).  Section 10.18 has nothing to do with a

---

[16] Indeed, not only has ETS failed to cure its misuse of Actuate's Named Developer licenses, but ETS has failed to remit funds clearly owed to and demanded by Actuate based on ETS's misuse to date.  *See* (Nyugen Ex. E)                REDACTED

REDACTED

party's right to *terminate* under the Agreement.[17]  In any event, ETS's claim that Actuate had

knowledge of ETS's multiple breaches should be rejected.  As an initial matter, ETS fails to prove

that Actuate had knowledge of ETS's continuous unauthorized access to Actuate's development

software via ETS's production servers in the period leading up to Actuate's December 2008 notice

letter – each instance of which constitutes a breach of the License Agreement.  Moreover, ETS's

brief is entirely devoid of any suggestion – let alone proof – that Actuate had knowledge of ETS's

improper use of development software by individuals other than the five authorized developers.  *See*

*supra* at Section I.A.2.  This breach alone is sufficient to justify Actuate's termination of the

License Agreement.

## II.   ETS HAS FAILED TO DEMONSTRATE IT WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF A PRELIMINARY INJUNCTION

Even if ETS were able to demonstrate a likelihood of success on the merits – which, as

discussed above, it cannot – ETS has utterly failed to show that it would suffer irreparable harm

should the Court deny its request for emergency relief.  To show irreparable harm, "a plaintiff must

demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a

trial." *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994) (internal quotations and

citation omitted).  It is well-settled that harm that is fully compensable with monetary damages does

not constitute "irreparable harm." *Id.*  As the Third Circuit has stated:

> The key word in this consideration is irreparable.  Mere injuries, however
> substantial, in terms of money, time and energy necessarily expended in the
> absence of a stay, are not enough.  The possibility that adequate
> compensatory or other corrective relief will be available at a later date, in the
> ordinary course of litigation, weighs heavily against a claim of irreparable
> harm.

---

[17] ETS itself appears to acknowledge this in the heading of the applicable section of its brief, which
alleges that "Actuate is time-barred *from bringing claims* based on its allegations." ETS Brief at 18
(emphasis added).

*Id.* (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (internal citations and quotations omitted));

*see also Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989) ("The

preliminary injunction must be the *only* way of protecting the plaintiff from harm.") (emphasis

added).  For this reason, the Third Circuit has routinely found preliminary injunctions inappropriate

in the context of contract disputes. *See, e.g., Bennington Foods LLC v. St. Croix Renaissance

Group, LLP*, 528 F.3d 176, 180 (3d Cir. 2008); *Instant Air Freight Co.*, 882 F.2d at 805.[18]

    No doubt aware of this authority, ETS attempts to turn this straightforward contract dispute

into something that would warrant the extraordinary relief it seeks.  Specifically, ETS relies on three

supposed effects of Actuate's termination that – according to ETS – allegedly would result in

irreparable harm.  As discussed below, however, ETS fails to meet its burden with respect to any of

the three.

### A.    Alleged Harm To ETS's Business, Even If True, Is Not "Irreparable"

    ETS first contends that, should the Court deny its request for an injunction, ETS would be

unable to produce score reports for some of its tests, thereby causing ETS's business to suffer.  This

contention should be rejected.  As an initial matter, ETS has failed to demonstrate that it would be

---

[18] The district of New Jersey cases that ETS cites for the proposition that courts grant preliminary injunctions "when the non-movant seeks to terminate a critical agreement" are inapposite. (ETS Brief at 11).  Each of these cases involved termination of a distributorship agreement constituting the entirety of the moving-party's business.  In such circumstances, courts in this Circuit hold that termination of the agreement constitutes irreparable harm because a party should not be allowed to go out of business and then seek damages in court. *Emergency Accessories & Installation, Inc. v. Whelan Engineering Co*, Civil Action No. 09-2652 (JEI/AMD), 2009 WL 1587888, *6 (D.N.J. June 3, 2009) (irreparable harm where termination of "Master Distributorship Agreement ... would be, in effect, the death knell for [plaintiff]."); *Atl. City Coin & Slot Serv. v. IGT*, 14 F. Supp. 2d 644, 668 (D.N.J. 1998) (irreparable harm where termination of contract by "one's only substantial client"); *see also Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 908 (2d Cir. 1990) (failure to supply photos would result in plaintiff having no other source of photos thereby likely resulting in loss of most of its subscribers).  Here, the agreement at issue is not a distributorship agreement and ETS makes no argument (let alone presents any proof) that termination of the Agreement would force it out of business or otherwise result in a loss of most of its customers.  The other case cited by ETS is non-precedential and contains virtually no analysis or discussion and therefore is not persuasive. *See Peter Kiewet Sons' Inc. v. Atser, LP*, No. 8:08CV541, 2009 WL 103537 (D. Neb. Jan 12, 2009).

unable to generate score reports in the absence of an injunction or, in the event its ability to generate reports is in fact compromised, for how long.  To the contrary, ETS itself has acknowledged that, at the time it filed the instant action, efforts to replace Actuate's software were already underway.  *See* Complaint at ¶ 35.  Without any information as to the status of these efforts – including when they are expected to be completed, if not already – ETS's conclusory assertion that it will not be able to produce certain score reports absent an injunction cannot be credited.  *See, e.g., Bennington Foods*, 528 F.3d at 179 (vacating injunction where, among other things, movant failed to identify "any attempts—futile or otherwise—it has made to fulfill contracts to deliver scrap metal by obtaining it from other sources").

Even assuming ETS's inability to generate certain score reports in the absence of an injunction, any resulting harm to ETS's business is insufficient to constitute irreparable harm.  By ETS's own admission, the software in question is used to generate only a small portion of the test reports annually prepared by ETS, such that any impact on ETS's business is necessarily limited.  *See* Complaint at ¶¶ 2-3 (while ETS develops and scores more than 50 million standardized tests annually, only approximately    REDACTED utilize the Actuate software at the center of this dispute).  Although ETS briefly alludes to certain unspecified business units that allegedly would be forced to close absent an injunction, *see* Jacob Decl. ¶ 31, this conclusory statement is wholly unsupported and thus cannot form the basis for an injunction.  *See, e.g., Instant Air Freight Co.*, 882 F.2d at 802-03 (finding no irreparable harm where movant failed to adequately substantiate its claim that termination of the contract at issue would cause it to go under, stating "we . . . have no clear factual record apart from general statements to the effect that Instant will no longer exist as a result of the termination.").  Indeed, ETS fails to provide *any* detail as to the actual impact termination would have on its business as a whole, but rather relies on the same types of general statements the Third Circuit has previously found to be insufficient.  *See id.*

In any event, even if ETS were able to show that the impact on its business would be substantial, the Third Circuit has made clear that such harm can be fully compensated by money damages and thus is not irreparable. *See id.* (harm fully compensable and thus not irreparable where failure to issue injunction would cause movant to lose 80% of its business); *Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102-03 and n.4 (3d Cir. 1988) (even where "substantial lost profits" would result from loss of an entire market segment, constituting over 25% of the movant's business, harm is fully compensable and thus not irreparable).[19] That ETS is a non-profit does not change the analysis.  The Third Circuit has made clear that "[t]he standards for the grant of a preliminary injunction are equally applicable to a non-profit corporation as to one organized for profit."  *See ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) (holding that non-profit plaintiff in a contract action would not be irreparably harmed absent an injunction).

**B.     ETS's Potential Breach Of Agreements With Customers Does Not Constitute Irreparable Harm**

ETS next asserts that, absent an injunction, it will be irreparably harmed because it will be compelled to breach contracts with third parties.  This argument, too, is unpersuasive.  To start, as discussed above, ETS has failed to come forward with evidence that it in fact is unable to produce test reports without use of Actuate's software, and thus cannot fulfill its contractual obligations. Having failed to provide any specific information as to the status of its admitted efforts to replace the Actuate software (or on the supposed contracts it would be unable to perform, for that matter), ETS cannot rely on the presumed failure of these efforts as a basis for injunctive relief.  *See supra.* Moreover, even if ETS successfully demonstrated that it would be unable to fulfill specific

---

[19] Indeed, in the lone case from this District cited by ETS, the movant alleged that, absent an injunction, the company would self-destruct.  *Emergency Accessories & Installation, Inc. v. Whelen Engineering Co.*, Civil Action No. 09-2652 (JEI/AMD), 2009 WL 1587888 (D.N.J. June 3, 2009). ETS does not even attempt to make (let alone support) such an allegation here.

contractual obligations, such a showing is plainly insufficient to constitute irreparable harm.  *See Bennington Foods,* 528 F 3d at 178-79 ("[A] plaintiff in a breach of contract case cannot convert monetary harm into irreparable harm simply by claiming that the breach of contract has prevented it from performing contracts with others . . . ."); *see also Apollo Technologies Corp. v. Centrosphere Indus. Corp.*, 805 F. Supp. 1157, 1208 (D.N.J. 1992) (alleged damage caused by loss of third party contracts fully compensable with money and thus cannot form the basis for a finding of irreparable harm).  Finally, to the extent ETS suggests it would be exposed to "substantial liabilities" should it be unable to satisfy contracts, such liabilities – in addition to being fully compensable with money – are too speculative and remote to constitute irreparable harm.  *See, e.g., Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) ("[A] showing of irreparable harm is insufficient if the harm will occur only in the indefinite future.  Rather, the moving party must make a clear showing of *immediate* irreparable harm.") (emphasis added) (internal quotations and citation omitted); *Apollo Tech. Corp.*, 805 F. Supp. at 1209 (no irreparable harm where movant failed to show loss of customer contracts to be "immediate and probable").[20]

### C.   ETS Cannot Establish Irreparable Harm Based On Alleged Loss Of Customer Goodwill

In its third and final attempt to demonstrate irreparable harm, ETS asserts that it would "likely risk losing" existing and prospective customers and customer goodwill should termination occur.  *See* ETS Brief, p. 22.  As discussed above, to the extent ETS is concerned with the actual loss of existing or prospective customers, this harm – in addition to being entirely speculative – is

---

[20] For these reasons, courts have found the mere risk of potential lawsuits insufficient to constitute irreparable harm.  *See Precision Links Inc. v. USA Prods. Group, Inc.*, Civil No. 3:08cv576, 2009 WL 3076114, *8 (W.D.N.C. Sept. 22, 2009) (holding that risk of potential lawsuits were "speculative allegations" that were "insufficient to satisfy the Plaintiff's burden of establishing irreparable harm."); *Am. Cent. Eastern Texas Gas Co. v. Union Pacific Resources Group, Inc.*, No. 2:98CV0239-TJW, 2000 WL 33176064, *1 (E.D. Tex. July 27, 2000) (holding that the "the potential of additional lawsuits and increased litigation costs ... is not irreparable harm.").

fully compensable. *See supra.* With respect to ETS's reference to reputational damage and loss of customer goodwill, the Third Circuit has made clear that such harms have been found to constitute irreparable injury in limited circumstances only; namely, in trademark and false advertising cases, where issues of customer confusion and deception arise. *See Acierno*, 40 F.3d at 653-54; *Ortho Biotech Products v. Amgen Inc.*, Civil No. 05-4850 (SRC), 2006 WL 3392939, *8 (D.N.J. Nov. 21, 2006).[21] Unlike in a trademark or false advertising case, here there is no allegation that Actuate is doing anything to *directly* harm ETS's reputation with its customers, rendering this instant dispute no different than the run-of-the-mill contract action. *See Bennington Foods*, 528 F.3d at 180.

In sum, despite ETS's best efforts to make it seem otherwise, this dispute is and remains a straightforward contract dispute, and the harms alleges by ETS – to the extent they are ultimately proven and available damages on a contract claim – remain fully compensable by monetary damages. Accordingly, having failed to demonstrate immediate irreparable injury, ETS's motion for a preliminary injunction must be denied.

## III.    THE REMAINING FACTORS FAVOR DENIAL OF ETS'S MOTION

A consideration of the remaining factors likewise compels the Court to deny ETS's motion. *First*, unlike ETS, which will suffer no irreparable injury on its breach of contract claim should the Court deny its motion (*see supra*), Actuate will suffer significant harm should ETS's motion be granted. The unauthorized use of Actuate's software amounts to copyright infringement, which is "presumed to give rise to irreparable harm." *Educ. Testing Servs. v. Katzman*, 783 F.2d 533, 543-44 (3d Cir. 1986). Indeed, tens of billions of dollars in revenue are lost each year by software companies due to unauthorized uses of software. (Boudraa Decl. ¶5). Allowing ETS to continue

---

[21] Indeed, of the two cases cited by ETS on this point, one is a trademark case and the other a false advertising case. *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700 (3d Cir. 2004) (trademark infringement case); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578 (3d Cir. 2002) (false advertising case).

using Actuate's software in the face of its multiple material breaches would enable ETS (and other Actuate customers) to exceed the scope of their licenses with impunity and without regard to their agreed upon consequence of immediate termination.

ETS's suggestion that Actuate somehow deserves the harm that would ensue if an injunction is issued is absurd. Based on nothing more than an apparent Pacer search, ETS attempts to paint Actuate as some sort of bad actor because it has been involved in four lawsuits in which Actuate has sought to enforce its rights under applicable agreements. What ETS does not reveal, however, is that in not one of these lawsuits was Actuate found to have wrongfully terminated the governing agreement – *or to have engaged in any wrongful conduct whatsoever, for that matter*. (*Id.* at ¶8). That software licensees have routinely flouted limitations on the scope of the licenses they have paid for should not be held against Actuate.

***Second***, contrary to ETS's suggestion, the public interest does not favor granting the emergency relief requested by ETS. Courts in the Third Circuit have found the public interest to be implicated where the granting or denying of injunction would further a specific public policy as expressed in legislation,[22] or where public health or safety is at issue.[23] ETS does not and cannot allege that such circumstances are present here. Indeed, ETS does not cite one case in support of its assertion that the supposed public interest concern alleged by ETS – namely, the fact that ETS "offers services to a broad range of the public-at-large" (see ETS Brief at 24) – is the type of concern that courts in this Circuit recognize when analyzing this factor.

---

[22] *See, e.g., Tanimura & Antle, Inc. v. Packed Fresh Produce, Inc.*, 222 F.3d 132, 140 (3d Cir. 2000) (finding issuance of injunction in the public interest where "the statutory purpose" of the Perishable Agricultural Commodities Act "explicitly encapsulates this"); *SK & F Co. v. Premo Pharm. Lab., Inc.*, 625 F.2d 1055, 1067 (3d Cir. 1980) (in assessing the public interest factor, courts must look to the public policies embodied in the laws which are the subject of the action).

[23] *See, e.g., Commonwealth of Pennsylvania v. U.S. Department of Agriculture*, 469 F.2d 1387, 1388 (3d Cir. 1972) (public interest implicated where there "was the possibility of substantial harm to the public" due to "inadequacies in the Pennsylvania meat inspection program").

## CONCLUSION

For the reasons stated above, Plaintiff's motion for a preliminary injunction should be denied.

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI,
PROFESSIONAL CORPORATION

By: s/Tonia Ouellette Klausner

Tonia Ouellette Klausner
Wilson Sonsini Goodrich & Rosati, P.C.
1301 Avenue of the Americas
40th Floor
New York, New York 10019-6022
(212) 999-5800
tklausner@wsgr.com

James A. DiBoise*
Wilson Sonsini Goodrich & Rosati, P.C.
One Market Street
Spear Tower, Suite 3300
San Francisco, CA 94105
(415) 947-2000
jdiboise@wsgr.com

Dylan J. Liddiard
Wilson Sonsini Goodrich & Rosati, P.C.
650 Page Mill Rd.
Palo Alto, CA 94304
(650) 493-9300
dliddiard@wsgr.com

*pro hac vice admission pending