## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| EDUCATIONAL TESTING SERVICE,<br><br>     Plaintiff,<br><br>  v.<br><br>ACTUATE CORPORATION,<br><br>     Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Civil Action No 3:10-cv-01293-AET-TJB**<br><br>**NON-CONFIDENTIAL REDACTED VERSION** |

### REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF EDUCATIONAL TESTING SERVICE'S APPLICATION FOR AN ORDER TO SHOW CAUSE SEEKING THE ENTRY OF A PRELIMINARY INJUNCTION TO MAINTAIN THE STATUS QUO AND PREVENT DEFENDANT ACTUATE CORPORATION FROM WRONGFULLY TERMINATING THE PARTIES' LICENSE AGREEMENT

Liza M. Walsh
Rukhsanah L. Lighari
CONNELL FOLEY LLP
85 Livingston Avenue
Roseland, New Jersey 07068
(973) 535-0500

OF COUNSEL
Peter D. Vogl
JONES DAY
222 East 41st Street
New York, New York 10017-6702
(212) 326-3939

Joseph Melnik
JONES DAY
1755 Embarcadero Road
Palo Alto, California 94303
(650) 739-3939

*Attorneys for Plaintiff,*
*Educational Testing Service*

## **TABLE OF CONTENTS**

Table of Contents ................................................................................................................. i

Table of Authorities ........................................................................................................... ii

I.     Statement of the Case ............................................................................................. 1

II.    Argument ................................................................................................................ 2

        A.     ETS will likely succeed on the merits .......................................................... 2

              1.     ETS did not misuse development software for production ............................. 3

              2.     ETS used development software with the permitted number of developers .................................................................................................. 6

        B.     ETS will suffer irreparable harm without receiving its requested relief ...................... 7

              1.     Irreparable harm to ETS's business ................................................................ 9

              2.     Irreparable harm based on breach of ETS's agreements with others ............. 11

              3.     Irreparable harm from loss of goodwill, market share and reputation .................................................................................................. 12

        C.     ETS has demonstrated that the balance of hardships favors ETS .............................. 13

        D.     ETS has demonstrated that public interest favors granting ETS's motion ................. 14

III.   Conclusion ............................................................................................................ 15

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Apollo Tech. Corp. v. Centrosphere Indus. Corp.*,
805 F. Supp. 1157 (D.N.J. 1992) ...................................................................................11

*Bergen Drug Co. v. Parke, Davis & Co.*,
307 F.2d 725 (3d Cir. 1962) ...............................................................................10, 12, 13

*Educ. Testing Serv. v. Katzman*,
793 F.2d 533 (3d Cir. 1986) ...........................................................................................14

*ECRI v. McGraw-Hill, Inc.*,
809 F.2d 223 (3d Cir. 1987) ...........................................................................................10

*Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*,
847 F.2d 100 (3d Cir. 1988) ...........................................................................................10

*Hansen Sav. Bank v. Office of Thrift Supervision*,
758 F. Supp. 240 (D.N.J. 1991) .....................................................................................12

*Highmark, Inc. v. UPMC Health Plan, Inc.*
276 F.3d 160 (3d Cir. 2001) .............................................................................................3

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
882 F.2d 797 (3d Cir. 1989) ...........................................................................................10

*Marchio v. Letterlough*,
237 F. Supp. 2d 580 (E.D. Pa. 2003) .............................................................................13

*Novus Franchising, Inc. v. Taylor*,
795 F. Supp. 122 (M.D. Pa. 1992) .................................................................................13

*Plate Fabrication & Machining, Inc. v. Beiler*,
2006 WL 14515 at *7 (E.D. Pa. Jan. 3, 2006) ...............................................................13

*S. Camden Citizens in Action v. N.J. Dept. of Env. Prot.*,
145 F. Supp. 2d 446 (D.N.J. 2001) ..................................................................................7

I. **STATEMENT OF THE CASE**

Despite Actuate's protestations and hand waving, ETS *has* made the requisite showing for the Court to issue an order maintaining the status quo, and to prohibit Actuate from terminating ETS's ability to provide score reports to students, professionals and institutions during this litigation. ETS has provided evidence in its opening memorandum, and again herein, that if ETS were prohibited from using the Actuate software, the harm would be immediate and irreparable not only to ETS, but also to the public-at-large. ETS has *no other way* to generate score reports for a significant portion of the ETS-provided examinations other than with the Actuate software. Loss of the right to use this software would mean that hundreds of thousands, and possibly millions, of students and professionals would be unable to meet the requirements for admission, advancement or licensure through no fault of their own. Similarly, ETS would suffer incalculable damage to its reputation and business by not being able to fulfill one of the most critical aspects of its business. Test-takers and institutions across the globe would be left to wonder whether score reports will be delivered in time to meet institutional deadlines, inexorably leading to an exodus from ETS programs to those of its competitors. Actuate realizes the difficult position that ETS and the public are in, and utilizes this fact to demand more money from ETS for alleged breaches ETS never committed.

In addition, ETS has provided compelling evidence showing that the Actuate software has always been used within the restrictions of the March 31, 2005 End User License Agreement ("License Agreement"), including sworn statements from ETS's IT Manager and Lead Software Engineer for the score reporting group responsible for use of the Actuate software. Specifically, the evidence shows that: (1) ETS never used more of the Actuate software than was licensed; (2) ETS's proper use of the Actuate software was confirmed when ETS installed temporary Version 9 license keys received from Actuate without any loss of functionality in the ETS systems; and

1

(3) software license key number 21428 – which is at the very center of Actuate's arguments – is "faulty," and was installed on ETS's production servers by *Actuate* as part of a REDACTED REDACTED professional services contract purchased by ETS.

Actuate merely provides this Court with suggestions of alleged breaches of the License Agreement unsupported by the terms of the agreement itself. Straining the bounds of reason, Actuate goes so far as to suggest that *ETS* breached the License Agreement even though *Actuate* supplied and installed a key (*i.e.*, the 21428 license key) that *Actuate* now admits was "faulty," since it expressly indicates that it was for production, not development, purposes. Yet, the Court need not engage in a detailed analysis of software keys, or whether such keys are for CPU-based licensed software or developer licensed software. Rather, the pertinent inquiry for the Court is whether the Actuate software, as installed and configured *by Actuate* on ETS's servers, was used by ETS in a manner consistent with the terms and conditions of the License Agreement.

At the end of the day ETS has satisfied its burden to warrant preliminary injunctive relief. Nothing within Actuate's opposition brief, or supporting papers, change this. Accordingly, ETS's application should be granted.

## II.   ARGUMENT

### A.   ETS will likely succeed on the merits

In its December 2008 letter that led to Actuate's wrongful termination of the License Agreement, Actuate accused ETS of breaching the License Agreement in three separate ways: (1) ETS used unlicensed development software options for production purposes; (2) ETS used licensed development software options with more than the permitted number of developers; and (3) ETS improperly transferred Actuate's software to a new computer hardware environment. (Opening Melnik Decl. Ex. 3). Actuate's opposition brief, however, fails to provide any

2

substantive response as to the third allegation (alleged improper transfer), thus demonstrating the weakness of that claim.[1]

The remaining two allegations fare no better. Actuate's response to ETS's showing of a likelihood of success on these two allegations is to ignore the License Agreement it signed, and the role it played, pursuant to the Professional Services Agreement, in installing and configuring its software on ETS's servers for which it was paid approximately REDACTED And when those avenues are not sufficient to refute ETS's showing, Actuate simply ignores ETS's evidence.

As demonstrated in its opening brief, and again herein, both the facts and the law support ETS's request to maintain the status quo during the pendency of the case. "[O]n an application for preliminary injunction, the plaintiff need only prove a prima facie case, not a certainty that he or she will win." *Highmark, Inc. v. UPMC Health Plan, Inc.* 276 F.3d 160, 173 (3d Cir. 2001). ETS has more than met this burden.

### 1.    **ETS did not misuse development software for production**

Of significance, Actuate does not seriously attempt to refute ETS's *proof* that it did not use or access any unlicensed development options on its production servers. This proof came when ETS installed a locked-down Version 9 *production* key on its production server (as opposed to what Actuate claims was a fully-open Version 8 *development* key: number 21428), and was able to successfully generate test score reports (*i.e.*, did not lose any functionality) (Jacob. Decl. ¶¶ 22-23).[2] Merely calling ETS's successful experiment a "conclusory assertion" from which there is "no basis to credit" fails to rebut ETS's dispositive evidence. (Opp. 14).

---

[1] Actuate relegates its discussion of this supposed ETS breach to just one sentence in a footnote in its brief, and backtracks from its position in the December 2008 letter. (Opp. 16, n.15).

[2] ETS's Version 9 experiment establishes not only that ETS did not use unlicensed software, but that it did not even access it. The locked-down Version 9 keys did not enable ETS to access

3

Actuate also seeks to implicitly rewrite the License Agreement to prohibit the mere installation of an improper license key *even when no unlicensed software is accessed or used*. Actuate, however, does not cite to the agreement for this newly conjured restriction because it cannot. Nonetheless, in an attempt to manufacture a breach, Actuate relies on language outside the agreement; namely, language used in *emails* to which Actuate attaches its license keys. (Opp. 7-8). In doing so, Actuate ignores that the License Agreement explicitly provides that it "constitutes the entire, final, complete and exclusive agreement between the parties."[3] Moreover, under the License Agreement, there *is no breach* unless ETS "accessed or used" unlicensed software. (Opening Melnik Decl. Ex. 1 at § 2.06). ETS's evidence discussed above proves there was no breach.

Building upon its unsupported accusations, Actuate next attempts to shift its own mistakes to ETS, even though ETS paid Actuate approximately REDACTED for thousands of hours of work (in both the development and production environments) under the Professional Services Agreement to assist ETS with, among other things, the installation of Actuate software. (Hofmann Decl. ¶ 5-6; Reply Melnik Decl. Ex. 1 at 5; Ex. 2 at 5). Specifically, ETS hired Actuate to, *inter alia*, "[i]nstall and configure Actuate products like; i-Server." (Reply Melnik

---

(continued…)

unlicensed functionality (Jacob Decl. ¶ 22), so any attempt to do so would have caused an error. When ETS tried the Version 9 software, though, there was no error. (*Id.* ¶¶ 22-23).

[3] Furthermore, applying the email language relied on by Actuate to the 21428 key (which incontrovertibly is a "CPUBased" license key) would, if not barred from consideration by § 10.24 of the License Agreement, directly contradict § 2.05 which governs the use of production software. (Opening Melnik Decl. Ex. 1).

4

Decl. Ex. 3 at 4-7; Ex. 4 at 12-15). Such "installation" responsibilities included Actuate software license keys. (*See* Reply Melnik Decl. Ex. 5 at 4).[4]

Actuate's reliance on an email from Gerald Hofmann for the idea that ETS installed the keys is misplaced. (Opp. 14-15). This email, at most, indicates that Hofmann learned, years after Actuate performed the initial installation, that the same key was installed on four production servers – not that ETS performed the installation. (Opening Melnik Decl. Ex. 3). Moreover, nothing in the License Agreement requires different keys to be installed on each server. In fact, Actuate has never alleged a breach merely because ETS used a single key on multiple servers, likely because Actuate knows that such actions are not prohibited. As a result, the Hofmann email is nothing more than a red herring used by Actuate in an attempt to distract this Court's attention away from the fact that Actuate has not presented any evidence that rebuts ETS's evidence proving that no breach of the License Agreement has occurred.

Lastly, Actuate suggests that even though ETS paid REDACTED for Actuate's professional expertise in performing, among other things, the installation of the Actuate software, Actuate should bear no responsibility for its failures in adequately providing the purchased services. (Opp. 14-15). The reason ETS spent so much for Actuate's expert assistance was to take advantage of Actuate's self-professed expertise with its own software. (Reply Melnik Decl. Ex. 6 at 3: describing Actuate's e.Services group as having "an in-depth knowledge of Actuate products and related technology," experience from "over 1,600 Actuate deployment projects," and the "average [Actuate] consultant [having] over 3 years of hands-on experience with Actuate technology."). But if Actuate, with all of its expertise, cannot avoid

---

[4] Exhibit 5 to the Reply Melnik Declaration is an April 1, 2005 Status Report from Actuate employee, Tracey Hacker, who worked on-site at ETS. The report expressly lists "Actuate software license key" on the "Actuate installation preparation list." (*Id.*).

5

sending ETS a license key containing a so-called "typical software bug", how is ETS, unfamiliar with Actuate's software, supposed to recognize the bug? (Opp. 13). And while Actuate faults ETS for not "seek[ing] clarification from Actuate," how could ETS seek any more clarification than *relying on Actuate employees to perform the installation*? If ETS allegedly could have determined that key 21428 was a development key with only a "quick review" – despite no statements to that effect in the email sending the key (*see* Nguyen Decl. Ex. E at 1) – then Actuate's trained staff certainly should have been able to do the same. Actuate, not ETS, should bear the burden of Actuate's actions.

### 2. ETS used development software with the permitted number of developers

Actuate's suggestions that it "discovered that over three hundred log-in names had been created" and used by ETS, and the ETS's assertions that these log-in names are used to develop and test reports "defies credulity" are both disinguous and mischaracterizes the facts. (Opp. 16). In fact, in October 2008, two months prior to the time when "Actuate brought this discrepancy to ETS's attention," ETS sent an e-mail to Actuate's Dylan Boudraa describing the existence of the 300 user ID's on ETS's development servers. (Reply Melnik Decl. Ex. 7 at 1). In that email, ETS explained that these user ID's are created to "sufficiently develop and test our on-demand reports . . . ." (*Id.*). Furthermore, the original idea of importing user ID's from ETS directory services originated with *Actuate's* employee, Tracy Hacker, in May 2005. (Reply Melnik Decl. Ex. 8: describes that creating user ID's for the Actuate software can be automated by sourcing such ID's from an external directory service). Thus, what Actuate has "discovered" is simply the implementation of an idea suggested by Actuate's own employees to develop and test on-demand reports by creating a sufficiently large number of user ID's on the development server to mimic a production environment where multiple users may access the report.

Furthermore, ETS has never exceeded the permissible number of named developers under the License Agreement at any one time. Although the License Agreement states that development software REDACTED REDACTED as Actuate is well-aware, the License Agreement does not require ETS to inform Actuate of the names of its developers or to notify Actuate when the developer roster changes; nor did Actuate ever ask for such information. In fact, so long as ETS never permits the Actuate software to be "accessed or used" by more than the permitted number of developers at any one time, ETS has complied with its contractual obligations to Actuate. Accordingly, as Actuate has not, and cannot, present evidence that more than five "identified developers" – as opposed to the fictitious "developers" Actuate would have this Court believe are associated with the 300 user ID's discussed above – utilized the development software at any one time, Actuate cannot demonstrate that ETS has breached the License Agreement.

### B.   ETS will suffer irreparable harm without receiving its requested relief

ETS has clearly demonstrated that it will suffer extensive irreparable harm in the event that the status quo is not maintained, and ETS is required to cease using the licensed Actuate software. *See S. Camden Citizens in Action v. N.J. Dept. of Env. Prot.*, 145 F. Supp. 2d 446, 499-500 (D.N.J. 2001) (examining the totality of the circumstances to determine the potential irreparable harm). As a direct and immediate consequence, ETS would be unable to generate REDACTED of score reports for tests that have already been, or will soon be, administered to thousands of students and test-takers in the U.S. and abroad, and which would lead to a cascade of irreparable harms. (Tabbiner Decl. ¶ 3).[5]

---

[5] "(Tabbiner Decl. ¶ ___)" refers to the numbered paragraphs in the Declaration of Philip S. Tabbiner, filed concurrently herewith in support of ETS's application/motion.

Every year, millions of individuals of all ages spend countless hours preparing to take one or more of ETS's tests.[6] (Tabbiner Decl. ¶ 4). Such test-takers include, but are not limited to, public high school students taking exit examinations to qualify for graduation, students seeking admissions and scholarships to university and graduate-level programs, and individuals, such as teachers, seeking licensure or qualification for their chosen professions. (*Id.*).

The repercussions for ETS and each of the above-mentioned individuals would be staggering if ETS were denied the use of the Actuate software used to generate certain ETS test score reports. (*Id.* at ¶ 5). For example: (1) in California public schools, high school seniors without test reports demonstrating a passing score on CAHSEE would be denied high school diplomas; (2) non-native English speaking students seeking admission to one of over 7,000 educational institutions in over 130 countries would be denied the requisite TOEFL® test score reports to even be considered for admission; (3) non-native English speaking individuals seeking employment in business, industry, and government would be denied employment without the requisite TOEIC® test reports; (4) thousands of teacher candidates, including those in New Jersey, would be denied the necessary State-mandated licenses without the requisite Praxis test reports; and (5) ETS's reputation as a non-profit corporation committed to its mission of advancing the quality, equity and access to education by providing fair and valid assessments and related services, would be irreparably damaged by its inability to fulfill its moral and contractual obligations to test takers and institutions around the globe. (*Id.*). Despite Actuate's attempts to suggest otherwise, such harms are not compensable with money damages.

---

[6] Such tests include the California High School Exit Examination ("CAHSEE"), the Test of English as a Foreign Language™ ("TOEFL®") and the Test of English for International Communication™ ("TOEIC®"), the Praxis Series™ ("Praxis"), the Chicago Public Schools Math and Reading ("CPS") and High Schools that Work ("HSTW"). (Tabbiner Decl. ¶ 3).

8

Nonetheless, Actuate contends that, based on its self-described styling of this action as a "straightforward contract dispute," irreparable harm somehow cannot be shown. (Opp. 19). There is, however, nothing "straightforward" about the irreparable harm that ETS and its customers (*e.g.*, students, test-takers, educational and governmental institutions) will incur if ETS cannot continue to use the Actuate software. Conversely, Actuate will not realize *any harm* from ETS's continued use of the software during the pendency of this case, particularly because the license sold to ETS, and for which ETS has fully paid, was a perpetual license.

As explained below, Actuate's attempts to trivialize each of ETS's examples of irreparable harm set forth in its opening brief are without merit and should be rejected.

### 1. Irreparable harm to ETS's business

Actuate first tries to downplay the harm that would come to *ETS's business* should ETS not receive its requested relief. (Opp. 19-21). Actuate claims that ETS "has failed to demonstrate that it would be unable to generate score reports in the absence of an injunction." (Opp. 20). But ETS's Information Technology Manager, Kuruvilla Jacob, made clear in his declaration accompanying ETS's opening brief that ETS "would be unable to generate score reports for several of its biggest tests, for example: TOEFL®, TOEIC®, CAHSEE, HSTW, CPA and Praxis." (Opening Jacob Decl. ¶ 31; *see also* Tabbiner Decl. ¶ 3). Moreover, Actuate's claim in this regard is disingenuous given the thousands of hours Actuate employees spent on the installation and maintenance of the Actuate software for ETS, and the development, testing and production of test score reports, such as TOEFL® and CAHSEE.[7]

---

[7] Furthermore, even if ETS decided today to discontinue use of the Actuate software to generate its test score reports and migrate to a new software platform, this process will take a considerable amount of time. (Tabbiner Decl ¶ 6). Migrating to a different software platform would take close to a year. (*Id.*). However, more time would be needed to ensure that the new software platform worked properly before it could realistically be implemented to generate test score

Actuate next contends that any harm to ETS would be negligible since the Actuate software is used to generate "only a small portion of the test reports annually prepared by ETS." (Opp. 20). This argument misses the forest for the trees. Regardless of the total number of overall test reports generated by ETS, it cannot be disputed that ETS's example of REDACTED test reports generated by ETS, in 2009 alone, using the Actuate software is a large number.[8]

Finally, Actuate's suggestion that a company must be threatened with going out of business for irreparable harm to be found is without support.[9] Courts have found irreparable harm and issued injunctions where the movant's business would suffer greatly even if not completely collapse. *See, e.g., Bergen Drug Co. v. Parke, Davis & Co.*, 307 F.2d 725, 728 (3d Cir. 1962) (enjoining termination of a supply contract where defendant's products had "no functional equivalent" and termination might cause up to a quarter of plaintiff's customers to turn elsewhere). Actuate, once again, overreaches to in making its argument.

---

(continued…)

reports (*i.e.*, "go live"). (*Id.*). Accordingly, ETS has no present option – other than the Actuate software – to generate these test reports. (*Id.*).

[8] Any suggestion that ETS could simply use other, third-party software it currently uses to generate score reports on its other tests that are not reliant on Actuate's software is not only incorrect but misses the point. (Tabbiner Decl. ¶ 7). The test reports that are generated using the Actuate software took several years to develop and build with Actuate's assistance. (*Id.*). Accordingly, the Actuate software cannot be seamlessly replaced with some non-Actuate software currently licensed by ETS. (*Id.*).

[9] Accordingly, Actuate's attempt to distinguish the cases relied on by ETS should be given no weight whatsoever. (*See* Opp. 19, n.18). Indeed, two of the cases Actuate relies upon for this argument are more properly characterized as loss of volume cases. *See Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797 (3d Cir. 1989) (denying injunction preventing termination of shipping contract where movant only alleged that termination would cause a drop in its freight volumes and contract was due to end in nineteen months anyway); *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100 (3d Cir. 1988) (denying injunction preventing termination of a supply agreement for General Motors heavy trucks where movant sold other heavy trucks). Finally, in *ECRI v. McGraw-Hill, Inc.*, the movant presented only evidence on monetary loss. 809 F.2d 223, 227 (3d Cir. 1987).

### 2. Irreparable harm based on breach of ETS's agreements with others

Actuate next attacks ETS's irreparable harm evidence that ETS will breach multiple agreements with third parties should it be unable to use the Actuate software. (Opp. 21-22). Here, Actuate claims that ETS has failed to provide specific evidence on this issue and that, even if ETS could, failure to fulfill contractual obligations is not sufficient to show irreparable harm. (*Id.*). Actuate's arguments, however, miss the mark and should be rejected.

First, as stated in its opening brief, ETS is contractually obligated to, *inter alia*, provide score reports for tests that use the Actuate software. For example, ETS entered into contracts REDACTED

REDACTED (Reply Melnik Decl. Exs. 9 & 10).[10] Under both of these agreements, REDACTED *inter alia*, ETS's inability to perform the services outlined by the agreement. (Reply Melnik Decl. Ex. 9 at "Exhibit C" No. 7 "Termination for Cause"; and Ex. 10 at 3-4, No. 10 "Termination"). Such services include the generating and disseminating of test score reports. (*See, e.g.*, Reply Melnik Decl. Ex. 10 at Ex. A at 28-29). ETS would be in breach these – and other agreements – should it no longer be able to use the Actuate software. (Tabbiner Decl. ¶ 8). Contrary to Actuate's contention, such breaches would be immediate and definite. (Opp. 22).

Second, the cases relied on by Actuate to support its argument on this issue do nothing to help its cause. For example, in *Apollo Tech. Corp. v. Centrosphere Indus. Corp.*, not only was potential breach of contract the *only* claimed form of irreparable harm argued by the movant, but

---

[10] The REDACTED is renewable each year, and was renewed for the period beginning July 1, 2009 through June 30, 2010. (Reply Melnik Decl. Ex. 11).

the contracts in question were "entirely speculative" and "[movant has] not demonstrated that such contractual opportunities for it exist or will exist." 805 F. Supp. 1157, 1209 (D.N.J. 1992). Clearly, such is not the case here. Moreover, as explained above, the Court should look at the totality of the harms when making a determination of whether to issue preliminary injunctive relief. *See infra* at 7.

### 3. Irreparable harm from loss of goodwill, market share and reputation

Actuate's contention that ETS's irreparable harm in the form of loss of market share, goodwill and business reputation is somehow speculative, fully compensable with money damages, and/or only allowed in trademark and false advertising cases is also without merit.

While ETS is one of the largest providers of test administration and score reporting, this does not mean it is without competition. (Tabbiner Decl. ¶ 9). ETS faces increasing competition in the test assessment marketplace from numerous multi-national for-profit companies. (*Id.*) Should ETS be forced to return the Actuate software, ETS's score reporting production for CAHSEE, TOEFL®, TOEIC®, Praxis, HSTW and CPS would come to a screeching halt. (*Id.*) Unable to rely on ETS for these test reports, thousands of students and test-takers, and hundreds of educational and government institutions (including the New Jersey Department of Education) would have no choice but to seek out ETS's competition for replacement score reports. (*Id.*) Accordingly, there is nothing "speculative" about the loss of ETS's market share, and harm to its goodwill and business reputation that it has worked to build for over 60 years.

Moreover, loss of market share, and harm to business goodwill and reputation are recognized examples of harms that are *not* compensable through money damages, based on the difficulty in accurately quantifying such harm. *See Bergen Drug*, 307 F.2d at 728 ("It would be impossible to estimate or compute plaintiff's damages for the loss of good will which it will suffer"); *Hansen Sav. Bank v. Office of Thrift Supervision*, 758 F. Supp. 240, 247 (D.N.J. 1991)

("These losses affect [movant's] overall business reputation, which . . . may not have any calculable monetary value."); *Novus Franchising, Inc. v. Taylor*, 795 F. Supp. 122, 131 (M.D. Pa. 1992) (granting preliminary injunction and noting that damage to good will is too "nebulous" to ascertain in money damages). Actuate provides no legal support to suggest otherwise.

Finally, Actuate is incorrect when it states that courts in New Jersey and the Third Circuit will only find irreparable harm based on damage to reputation and goodwill in false advertising and trademark matters. (Opp. 22-23). Courts handling matters other than false advertising or trademark disputes have found irreparable harm based on, *inter alia*, damage to a movant's business reputation or goodwill. *See, e.g., Bergen Drug*, 307 F.2d 725; *Plate Fabrication & Machining, Inc. v. Beiler*, 2006 WL 14515 at * 7 (E.D. Pa. Jan. 3, 2006) (granting preliminary injunction against former employee where former employee's new business damaged the reputation of former employer); *Marchio v. Letterlough*, 237 F. Supp. 2d 580 (E.D. Pa. 2003) (granting preliminary injunction enforcing terms of boxing promotion contract where plaintiff's reputation was at risk). Accordingly, ETS has clearly shown irreparable harm, in several real and immediate forms, in the event it is compelled to cease using the licensed Actuate software.

### C. **ETS has demonstrated that the balance of hardships favors ETS**

Incredibly, Actuate alleges that the balance of hardships weighs in *its* favor because it will suffer harm if ETS' motion is granted. (Opp. 23-24). Actuate invokes a rebuttable presumption applied in copyright infringement cases. This argument, however, is flawed for several reasons. *First*, Actuate must first *prove* actual copyright infringement (*i.e.*, a likelihood of success that ETS is using Actuate's software in an unauthorized manner) before any alleged rebuttable presumption can be considered. As discussed above, Actuate's claims of breach by ETS simply do not hold water. *Second*, the case Actuate relies on to support this argument is clearly distinguishable from the situation here. (Opp. 23). In *Educ. Testing Serv. v. Katzman*,

13

793 F.2d 533, 543-44 (3d Cir. 1986), the Third Circuit noted the presumption of irreparable harm from a *finding* of copyright infringement, but went on to hold that the defendant's actions so damaged the plaintiff's ability to conduct its business in the market, that this alone satisfied the irreparable harm inquiry. Here, Actuate states that it provides software and related services throughout the world and has "over 4,500 customers globally." (Opp. 2). It strains credulity that ETS's licensed, and purely internal, use of Actuate's software could implicate Actuate's ability to conduct its business in the market.[11] *Third*, even if Actuate somehow stood to suffer some form of irreparable harm, any such harm does not outweigh the harm to ETS.

### D.   ETS has demonstrated that public interest favors granting ETS's motion

Finally, the public has a paramount interest in having ETS continue to provide these score reports without an undue interruption caused by wrongful termination of the License Agreement. The services offered by ETS impact broad segments of the public-at-large, including countless test-takers and students, college applicants, prospective teachers, job applicants, and educational and government institutions. (Jacob Decl. ¶¶ 3, 8). Indeed, the very State in which this action has been brought would be effected since the New Jersey Department of Education utilizes ETS's Praxis exams as part of its licensure and certification program for teachers. Wrongful termination of the License Agreement would cripple ETS's efforts to serve the teachers and New Jersey educational institutions relying on its delivery of timely and accurate Praxis results. Put simply, the public interest is best served by ETS's continued use of the Actuate software and the temporary restoration of the status quo.

---

[11] Actuate attempts to obscure its history of being sued for unscrupulous business practices. (Opp. 24). But it is a matter of record that Actuate has repeatedly been sued by licensees seeking to defend themselves against Actuate's groundless threats of termination. *See* Opening Br. at 23-24 (listing cases).

14

### III. CONCLUSION

For the foregoing reasons, and reasons set forth in ETS's opening brief, ETS's application should be granted.

Dated: April 19, 2010

By: /s/ Liza M. Walsh
Liza M. Walsh
Rukhsanah L. Lighari
CONNELL FOLEY LLP
85 Livingston Avenue
Roseland, New Jersey 07068
(973) 535-0500

OF COUNSEL
Peter D. Vogl
JONES DAY
222 East 41st Street
New York, New York 10017-6702
(212) 326-3939

Joseph Melnik
JONES DAY
1755 Embarcadero Road
Palo Alto, California 94303
(650) 739-3939

*Attorneys for Plaintiff*
*Educational Testing Service*

15